Filed 12/11/15  P. v. Camacho CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B259838 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA102870) |
| v. | |
| ALBERT CAMACHO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mike Camacho, Judge.  Affirmed.

Jonathan Milberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, and J. Michael Lehmann, Deputy Attorney General, for Plaintiff and Respondent.

A jury found defendant Albert Camacho (defendant) guilty of voluntary manslaughter for killing his girlfriend's brother, Ben Cervantes. Ben[1] lived in a house with his father Mike, his sister April (defendant's girlfriend), and April's three children. On the night in question, defendant and Ben quarreled, defendant entered the house to confront Ben, Ben and defendant fought, and defendant stabbed Ben multiple times with a long "katana" knife that Ben owned. Defendant testified at trial and claimed he killed Ben in self-defense. We are asked to decide whether the trial court improperly undermined defendant's self-defense claim by instructing the jury that an occupant of a house is entitled to use reasonable force to eject a trespasser who does not comply with a request to leave. We hold there was no error because the instruction did not foreclose defendant's proffered defense; rather, the instruction correctly stated the legal principles the jury should apply if it found, after weighing conflicting evidence, that defendant was a trespasser on the night of the killing.

## I. BACKGROUND

### A. The Prosecution's Case

Defendant and April were in a romantic relationship starting sometime in 2011, and they had a daughter together. April also had two sons from a previous relationship, Joseph (age nine at the time of trial) and his younger brother Isaiah. A few times per week, defendant would come to visit April at the house where she lived with her family, often in the early morning hours, and the two would usually meet outside rather than inside the house. According to Joseph, when defendant came to the house at night, April always went outside to meet him.

Defendant and Ben (April's brother) initially got along, but by the summer of 2013 their relationship was no longer amicable. In June 2013, Ben and defendant got into a fistfight in the street in front of the Cervantes house. Defendant pulled a utility

---

[1]     We refer to the members of the Cervantes family by their first names to avoid confusion.

knife out of his pocket at the time of the fight, but he did not use it against Ben. After the fight was over, defendant asked Ben, "Are we good?" Ben responded that it was not over for him.

Defendant had lunch with April at her house on August 16, 2013. April and defendant made plans to meet again later that night, and defendant returned to the Cervantes house sometime after 11:00 p.m. April was in bed, but Joseph woke her up and told her defendant had arrived. As April approached the front door, she could hear Ben and defendant arguing. Defendant was outside the house yelling, and Ben was inside the house standing at a window laughing at defendant. Defendant asked Ben to come outside, but Ben refused. Several neighbors were outside, including Abdon Huerta, Reida Ceballos, Anthony Gonzalez, and Diana Estrella.

The witnesses who testified during the prosecution's case described what was said during the exchange between defendant and Ben; the various accounts were generally consistent, but April's testimony differed in some respects from the testimony of two other witnesses. Reida Ceballos testified that Ben told defendant to "[g]et the fuck out of here" and did not invite defendant inside the house at any point. She also testified that defendant said, "If you don't come out here, I'm going to go in there and get you." Another neighbor, Diana Estrella, testified that Ben told defendant to get off the property. According to Estrella, neither Ben nor anyone else ever told defendant to come inside the house, but defendant told Ben that he was going to come inside and "beat his ass." April testified that Ben told defendant to get off the property before defendant came inside the house; Ben also said he was going to call the police. However, April also told the jury that later in the exchange between the two men Ben said something to defendant—she was not sure what it was, but it could have been "Come here, I have something for you." April testified that after Ben said something to defendant, defendant responded by saying, "Okay, I'm going inside."

Defendant went into the house through the unlocked front security door. Ben did not come to let him in, and April did not tell defendant to go into the house. Both April and Joseph described what they saw and heard after defendant entered the house.

3

According to Joseph, defendant slammed the front door "really hard" when he entered the house. Defendant and Ben started fighting when defendant jumped on Ben in the hallway, and the fighting moved to Ben's room. Later, Joseph ran past Ben's room and saw the men still fighting. Defendant was on top of Ben and was hitting him in the stomach. Joseph did not see a weapon in either man's hands, but Ben had blood on his stomach and head. Defendant had blood on his eyebrow. When defendant came out of the house, Joseph saw him carrying a knife that belonged to Ben, and the knife had blood on it. Defendant told the neighbors who were standing outside not to hang out with Ben and he told April not to call the police. Defendant then drove away on his motorcycle.

April gave a similar account of events. She told the jury that defendant looked like he was going to get into a fight when he opened the door into the house. April then went inside to get Joseph and bring him outside, and while she was inside she saw defendant and Ben fighting in the doorway of Ben's room. Defendant was on top of Ben, who was lying on his back. April had seen Ben's "katana knife", which he kept in his room, but she did not see defendant or Ben with the knife. April took Joseph outside, then returned inside with Joseph to see if defendant and Ben were still fighting. She saw both men in the same location and position, and they were still struggling; at some point while she was inside, April said she heard defendant say, "So, you're trying to stab me, huh?" After she saw that her brother and defendant were still struggling, April left the house and took Joseph to a neighbor's home. April started to go back inside the house again, but as she entered, defendant was leaving. April saw her brother get up from the floor near the doorway to his room, and she followed defendant outside. Defendant asked April if she was going to call the police, and she replied that she was not.

Two of the neighbors, Estrella and Ceballos, described defendant's actions after he left the house. According to Estrella, defendant told them that if they called the police, something bad would happen. Defendant pulled out a knife from behind his back, went to his motorcycle, and drove away. According to Ceballos, defendant walked outside, reentered the house, and then came back outside a second time. When he came out the

4

second time, he walked up to the neighbors carrying a knife, made derogatory comments about Ben, and said, "Whoever calls the cops is a dead motherfucker."

After defendant left the house, Ben was able to stand up, go into the bathroom, and stand under the shower. April looked in the bathroom and observed that Ben's breathing was off. He said he could not breathe. April ran to a neighbor's for help, and someone called 911. Ben had a pulse when paramedics arrived, but he did not survive.

Ben suffered eight stab wounds in total during the fight with defendant. Stab wounds to Ben's right lung and right temple were fatal; the chest wounds ranged from four to seven inches deep and the temple wound, which went through Ben's skull and penetrated the brain, was one and a half inches deep. Ben's blood was found in various locations in the house, including on one of the walls in his bedroom.

###### B.     Defendant's Testimony

Defendant testified in his own defense at trial. He acknowledged that his relationship with Ben was not amicable and blamed it on Ben's attempts to interfere in his (defendant's) relationship with April. Defendant testified that both Mike and April previously told him he was welcome at the house, but in order to avoid conflict he tried not to go there when Ben was home. Regarding the events on the night of August 16, 2013, defendant did not deny that he stabbed Ben. Instead, he provided the following account of events in support of his claim that he acted in self defense.

On the night of August 16, when defendant went to the door of the Cervantes home, he saw Ben in the entrance hallway. Ben went into his bedroom, then came to the window. Defendant asked Ben to get April. Ben refused, saying it was too late. Ben told defendant to get his "bitch ass" out of there. They argued and exchanged threats. Ben said he was going to call the police. Defendant walked to his motorcycle and he continued his yelling match with Ben from there. At some point, Ben said, "Well, bring your bitch ass in here." Defendant took this as a challenge and entered the house quickly.

Inside the Cervantes house, defendant approached Ben with his fist raised in preparation for a fight. Ben swung a knife, cutting defendant on his eyebrow. Defendant

5

rushed forward and the two men fell to the ground together. Defendant ended up on top of Ben. Ben held the knife behind defendant's neck, and defendant jabbed his thumb into Ben's eye, which caused Ben to drop the knife. Ben reached for the knife, but defendant grabbed it first. Defendant was afraid and stabbed Ben multiple times, aiming for Ben's shoulder. The final thrust of the knife hit Ben in the head, and Ben stopped struggling. Defendant dropped the knife in the hallway and left. During the fight, defendant did not think he might kill Ben, nor did he intend to kill Ben.

Outside, defendant saw people laughing. He told them that Ben was a "bitch." He did not see Estrella in the group of people, and he did not threaten her. As he left, he asked April if she was going to call the police. She replied that she would not.

### C. The Court's Instructions and the Jury Verdict

The trial court held a conference with counsel to discuss the instructions that should be given to the jury. The court stated that if it instructed the jury on the defense of of self-defense, it was inclined to grant the prosecution's request to include an instruction on "basically a forfeiture of a right of self-defense, given that there was an intrusion of the home occupied by the victim." The court explained that it would do so by modifying CALCRIM No. 3475 to fit the facts of the case, where it was the victim that was the occupant of the home, not the defendant. The court asked defense counsel for his views on whether to give the modified instruction, and defense counsel argued the instruction was not warranted because April's testimony established that defendant had implied consent to enter the home at "any given time." The trial court, however, pointed to other evidence in the record indicating Ben may have vitiated any such implied consent when he told defendant to get off the property. The court ultimately ruled the modified instruction should be given: "[I]t may be an issue of fact for the jury. I think the jury needs to understand that there are rules of law that would help them decide whether or not this right of self-defense is even applicable. . . . [¶] . . . [¶] [I]t's an arguable issue whether or not the defendant had a right to be inside that house in the first place or not. If . . . he did have a right to be there, then perhaps that bolsters a self-defense issue. If he

6

did not, for various reasons in the evidence, then perhaps that would help negate a self-defense issue. But that's something that the jury needs to decide based on the credibility of the evidence."

The modified version of the CALCRIM No. 3475 instruction the trial court gave the jury was phrased as follows: "The occupant of a home may request that a trespasser leave the home. If the trespasser does not leave within a reasonable time and it would appear to a reasonable person that the trespasser poses a threat to the home, the occupant may use reasonable force to make the trespasser leave. [¶] Reasonable force means the amount of force that a reasonable person in the same situation would believe is necessary to make the trespasser leave. [¶] If the trespasser resists, the occupant may increase the amount of force he uses in proportion to the force used by the trespasser and the threat the trespasser poses to the property. [¶] When deciding whether the occupant used reasonable force, consider all the circumstances as they were known to and appeared to the occupant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the occupant's beliefs were reasonable, the danger does not need to have actually existed." (Emphasis added.)

The jury found defendant not guilty of murdering Ben, but guilty of the lesser included offense of voluntary manslaughter in violation of Penal Code section 192.[2] The jury found true the allegation that Ben used a knife in the commission of the offense within the meaning of section 12022, subdivision (b)(1). The jury acquitted Ben of four counts of intimidating and dissuading witnesses—the neighbors who were outside—and one count of assault with a deadly weapon on a fellow jail inmate. Defendant admitted that he had suffered a prior serious felony conviction and had served a prior prison term for a different conviction. The trial court sentenced defendant to a total term of 29 years in state prison, consisting of the upper term of 11 years for the manslaughter conviction prison, doubled pursuant to the Three Strikes law, plus a five-year enhancement term for

---

[2]    All statutory references that follow are to the Penal Code.

the prior conviction allegation, a one-year enhancement term for the prior prison term, and a one-year enhancement term for the knife use.

## II. DISCUSSION

Defendant's defense at trial was that Ben invited him into the house to fight and then brought out the "katana" knife so quickly that defendant had no opportunity to withdraw from the fight and instead had to use deadly force to defend himself. Defendant argues the modified CALCRIM No. 3475 instruction deprived him of his right to a jury trial on his self-defense defense.[3] He makes two points, both of which are premised on the notion that the instruction allowed the jury to find that a necessary predicate for his self-defense theory was missing. First, defendant asserts the instruction was unwarranted and allowed the jury to find, without a proper evidentiary basis, that defendant was a trespasser—which would mean Ben's use of reasonable force against him was justified rather than the predicate for a valid claim of self-defense. Second, defendant claims the instruction incorrectly advised the jury that Ben had a right to use deadly force from the moment defendant first entered the house.

"It is settled that, even in the absence of a request, a trial court must instruct on general principles of law that are commonly or closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case." (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047.) "The trial court is charged with instructing upon every theory of the case supported by substantial evidence. . . . " (*Ibid.*) Evidence is substantial so as to warrant an instruction when it is "'sufficient to "deserve consideration by the jury," that is, evidence that a reasonable jury could find

---

[3] Respondent contends that defendant has forfeited his claim of federal constitutional error by failing to raise it in the trial court, and also by failing to provide supporting argument in his opening brief. We decline to find forfeiture and resolve the claim on the merits. (See *People v. Partida* (2005) 37 Cal.4th 428, 431; *People v. Yeoman* (2003) 31 Cal.4th 93, 117 ["As a general matter, no useful purpose is served by declining to consider on appeal a claim that merely restates, under alternative legal principles, a claim otherwise identical to one that was properly preserved. . . . "].)

persuasive.'" (*People v. Williams* (2015) 61 Cal.4th 1244, 1263; *People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8.)

"We review the trial court's decision [to give a jury instruction] de novo. In so doing, we must determine whether there was indeed sufficient evidence to support the giving of [the] instruction." (*People v. Cole* (2004) 33 Cal.4th 1158, 1206.)

In determining whether a jury instruction correctly conveys the law, we look to the instructions as a whole to see whether there is a reasonable likelihood the jury understood the instruction as the defendant contends. (*People v. McPeters* (1992) 2 Cal.4th 1148, 1191; see *Estelle v. McGuire* (1991) 502 U.S. 62, 72.) We presume that jurors are capable of understanding and correlating all the instructions given. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248.)

The trial court did not deprive defendant of his self-defense defense by giving the modified version of CALCRIM No. 3475. The instruction did not misstate the law, and defendant does not contend otherwise. Nor did the instruction compel the jury to find that defendant was a trespasser. Rather, the instruction merely summarized the legal principles that the jury should apply *if* it believed defendant was a trespasser when he entered the house on the night he killed Ben. In a separate instruction, the trial court told the jury that "[s]ome of [the] instructions may not apply, depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them." Thus, if the jury found that defendant was not a trespasser, the jury would have understood that the modified 3475 instruction did not apply.

Even though the instruction did not direct the jury to find that he was a trespasser, defendant argues the instruction undermined his defense because it *permitted* the jury to find he was a trespasser; in defendant's view, there was no substantial evidence on which the jury could so find. After reviewing the record, we do not share defendant's view. The evidence as to whether defendant had permission to enter the house on the night in question was conflicting, and there was evidence, sufficient to deserve consideration by

9

the jury, that defendant was in fact a trespasser. (See *People v. Williams, supra,* 61 Cal.4th at p. 1263 ["substantial evidence" that warrants jury instruction is "evidence sufficient to 'deserve consideration by the jury'"].)

Joseph testified that defendant did not come into the house when he visited at night; instead, defendant would wait outside for April.[4] Of course, that is precisely what defendant did when he first arrived at the house on the night he killed Ben—he waited outside until April came out to meet him. It was also undisputed that on the night in question Ben told defendant to leave the property and said he (Ben) was going to call the police. April testified that she did not tell defendant to go into the house on the night in question, and Mike, the owner of the house, was not at home that evening.[5] To be sure, there was evidence to the contrary—including testimony by April, who claimed that defendant was always "welcome" in the house and that the permission she gave him to be in the house for lunch earlier that day extended to his visit later at one in the morning— but it was up to the jury to decide whether to believe that testimony.[6] The modified CALCRIM No. 3475 instruction that the trial court gave therefore did not deprive defendant of a jury trial on his proffered defense—it simply gave the jury guidance on what it should do if it resolved the conflict in the evidence in favor of the conclusion that defendant was a trespasser.

We likewise reject defendant's contention that the modified instruction misled the jury into believing that if defendant was a trespasser he had no right to self-defense under

---

[4] Joseph's testimony was consistent with what defense counsel said the evidence would show when delivering his opening statement: "[Defendant], trying to remedy the situation as best he could, would not go inside the house. He would pick up his daughter outside the house, park alongside of the house so that he could avoid [Ben]."

[5] We note there was also evidence that Ben and defendant began fighting in the doorway to Ben's room and then inside Ben's room. Even if the jury believed that Mike had given defendant unfettered permission to enter the house, that permission would not be valid permission to enter Ben's room.

[6] April initially did not cooperate with police and gave them false information about who had been present in the house.

any circumstances. The instruction limits an occupant to using *reasonable* force, which is defined as the amount necessary to make the trespasser leave. The instruction also provides that if the trespasser resists, the occupant may increase the amount of force "in proportion to" the force used by the trespasser. Nothing in the language of the instruction informed the jury that Ben, as the occupant, could immediately use unreasonable deadly force against a trespasser, at least absent a reasonable belief that the trespasser was about to use deadly force.[7]

In sum, nothing in the trespass instruction directly conflicts with defendant's theory of the case, namely, that Ben used such sudden and unreasonable deadly force that defendant had no opportunity to escape and so was justified in using deadly force himself. There was sufficient evidence for the jury to find defendant was a trespasser on the night he killed Ben, but the instruction did not require the jury to so find. Furthermore, if the jury believed that defendant was a trespasser but also believed defendant's account of events inside the Cervantes house, the trespass instruction would not have prevented the jury from crediting defendant's claim that he acted in self-defense. Thus, defendant was not deprived of his constitutional right to present a defense.

---

[7]     In three sentences in his opening brief, defendant states there was no evidence on which the jury could have concluded he had an opportunity to escape from the fight before killing Ben, and he asserts the court's modified CALCRIM 3475 instruction was therefore inappropriate. This perfunctory assertion in the opening brief does not suffice to present the issue for decision. (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214, fn. 11.) But the assertion lacks merit in any event. The instruction states that the occupant should "request" the trespasser to leave the home. If the trespasser does not leave "within a reasonable time" then the occupant may use reasonable force to make the trespasser leave. Thus, the instruction does contemplate an opportunity for the trespasser to leave before the occupant uses any form of force.

## III.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BAKER, J.

We concur:

MOSK, Acting P.J.

KRIEGLER, J.

12